IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08MD1932-GCM

| | |
|---|---|
| IN RE FAMILY DOLLAR FLSA LITIGATION | ) ) ) ) ) ) ) ) ) ) ) |
| | ORDER |
| *Concerning McCarty v. Family Dollar Stores* | |
| Case No. 3:08-cv-1932 | |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. No. 935); Plaintiff's Response in Opposition (Doc. No. 950); and Defendant's Reply (Doc. No. 959). For the reasons set forth below, the motion is **GRANTED**.

## **FACTS**[1]

Plaintiff, Gary Peters, began working for Family Dollar in 1989 as a manager trainee, left Family Dollar in August 1995 after working as a Store Manager and Store Opener, and returned to Family Dollar in 2005 as a Store Manager.[2] (Doc. No. 935, Peters Dep. at 15-17, 41.) In

---

[1] To the extent Plaintiff makes any factual assertions based on the decision in *Morgan v. Family Dollar Stores, Inc.*, the court will disregard such assertions. The court will also disregard exhibits based on the *Morgan* case. In *Grace v. Family Dollar Stores, Inc.*, the Fourth Circuit Court of Appeals rejected Ms. Grace's argument that the facts in *Morgan* and in her case were identical; similarly, this Court finds no basis to support the assumption that the facts between Plaintiff's case and the *Morgan* case are the same. *See Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508 (4th Cir. 2011) (finding that potential variations between store size, store inventory, and the individual responsibilities of managers, as well as differences in managers' performance of exempt and nonexempt duties and the supervisory activity of district managers, precluded Plaintiff's argument that the facts in *Morgan* and in her case were identical).

[2] The Court notes that Plaintiff's declaration was prepared after Plaintiff's deposition and on many occasions directly contradicts his sworn testimony. Plaintiff cannot create a dispute about a fact contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony, for "it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." *Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010) (internal quotation marks and alterations omitted) (quoting *Halperin v. Abacus Tec. Corp.*, 128 F.3d 191, 198

1

2005 when Peters returned to Family Dollar he worked as the Store Manager of Store 1683 in San Antonio, Texas at all times during the relevant time period for Peters' claims in this matter. (Doc. No. 935, Peters Dep. at 20-23; DeBrocq Decl. ¶ 4.)[3]

Family Dollar paid Peters a weekly salary of $750 from August 14, 2005, to July 2, 2006, a weekly salary of $775 from July 3, 2006 to November 3, 2007, $804 from November 4, 2007 to May 31, 2009, and $822 per week from June 1, 2009 to April 8, 2011. (DeBrocq Decl. ¶ 4.) In addition, Peters also six earned bonuses during the relevant time period for his claims, including: $2,127 on July 14, 2006, $398 on October 6, 2006, $2,267 on July 13, 2007, $2,792 on July 11, 2008, $3,063 on July 10, 2009, and $3,455 on July 9, 2010. (*Id*. at ¶ 5.) Nonexempt employees were not eligible for these bonuses, which were tied to the store's performance as measured at inventory time. (Peters Dep. at 61; DeBrocq Decl. ¶ 5.) Peters worked an average of 55.69 hours per week as Store Manager at Store 1683 during the relevant time period. (DeBrocq Decl. ¶ 6.)

The record shows that of the forty-four nonexempt employees who worked at Peters' store during the relevant time period, twenty-one made $7 per hour or less, and the highest paid nonexempt employee earned only $8.50 per hour. (*Id*. at ¶ 9.) Even using the highest hourly wages earned by employees whose wages changed over time, the hourly employees who worked in Peters' store earned an average of $7.12 per hour during the relevant time period. (*Id*.)

---

(4th Cir. 1997); *see also Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 341 (4th Cir. 2001); *Rohrbough v. Wyeth Labs.*, 916 F.2d 970, 975-76 (4th Cir. 1990); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). To the extent that Plaintiff's deposition testimony and later affidavit are inconsistent, the Court will disregard the affidavit and rely on the testimony he gave in his deposition, where he was examined at length about his responsibilities as a manager of a Family Dollar store. *See Grace*, 637 F.3d at 513.

[3] Peters filed his opt-in consent form on September 26, 2010. Accordingly, September 26, 2007, or three years prior to his opt-in date, through the end of his employment on April 8, 2011, represents the longest possible relevant time period for Peters' claims in this action.

Family Dollar's records reflect that Peters managed at least 80 employee hours 100% of the time during the relevant time period. (*Id*. at ¶ 8.)

Peters contends that he devoted 90-95% of his time to performing nonexempt work, but also admits that he was responsible for running the store. (Peters Decl. ¶ 4, Peters Dep. at 60, 62, 175, 185-86.) For example, Peters testified that he had the authority and ability to direct other employees to perform nonexempt work, and decided whether it would be him or another employee who would clean the store, unload freight, or run the cash register, while his employees could not decide which tasks Peters would perform. (*Id*. at 172-75, 236-39.) Further, if Peters was not at the store, he would call the store on multiple occasions to check in, and would leave notes for his staff specifying what tasks needed to be done. (*Id*. at 216.)

Peters was responsible for many tasks and duties as part of his job. Specifically, Peters was responsible for: interviewing and screening employees and providing hiring recommendations; negotiating with the District Manager to obtain higher starting rates of pay for newly hired employees; completing hiring paperwork; training employees; scheduling employees; handling vacation and time off requests; supervising and directing employees' work; maintaining sales paperwork and handling the bank deposits; evaluating the work of his employees and recommending promotions; handling employee complaints and conflicts; counseling and disciplining employees when necessary; planning and directing work among his employees; maintaining the security and safety of the store; and ensuring that the store stayed within the allocated payroll budget. (Peters Dep. at 47, 70-78, 92-96, 100-02, 112, 114, 117-20, 130-32, 135-37, 141-42, 155-65, 177, 183, 212, 215-16, 222-23, 232, 236-40.)

Though Peters utilized a team concept in running his store, he served as the head of the team he built at his store. (*Id*. at 172-75.) Peters interviewed potential employees and provided

3

hiring recommendations. (*Id*. at 70-78, 233-34.) If Peters did not believe that a candidate would be a good fit at the store, he did not include that candidate in the group of candidates he recommended for hire to his District Manager. (*Id*. at 70-92.) Alternatively, if Peters believed the candidate should be hired, he made that recommendation to his District Manager. (*Id*.) Peters could recall only one instance where he was forced to hire someone that he did not agree with or recommend, and could not recall a single instance in which he was not involved in the hiring process for a position in his store. (*Id*. at 104-06.) Peters was the only person at Store 1683 that had discussions with the District Manager regarding interviewing and hiring candidates for positions at his store. (*Id*. at 224-25.)

Peters also handled customer complaints and managed the employees. (*Id*. at 137-39, 141-43, 145.) In terms of employee discipline, Peters gave either verbal or written warnings to his Assistant Store Managers and Associates. (*Id*. at 137-38.) While Peters indicated that his District Manager would also participate in the discipline/counseling of employees, Peters confirmed that the District Manager or Assistant District Manager never prevented Peters from disciplining or counseling an hourly employee. (*Id*.) Further, Peters stated that the District Manager or Regional Vice President "told [him] to discipline [his employees] sometimes, and if [he] didn't see the reason, [he] wouldn't." (*Id*. at 138-39.) In fact, Peters recalled that there was at least one employee that the District Manager wanted to terminate, but Peters "didn't feel like [he] had the grounds to terminate that person" and therefore did not terminate him. (*Id*.) In addition, Peters signed every Performance Improvement Action Plan for the employees at Store 1683 while he was Store Manager and also notified each employee of their Plan write-up. (*Id*. 141-42, 143.) Peters could not recall any instance where he thought an employee should be disciplined but the District Manager said, "No, you can't." (*Id*. at 145.)

As Store Manager, Peters reported to a District Manager. During the relevant time period Keith Sellers was the District Manager of District 73 from October 2005 to January 2010 and Jaime Lopez was the District Manager of District 73 from January 2010 through April 2011. (DeBrocq Decl. ¶ 7). Keith Sellers, or one of Sellers's Assistant District Managers, would visit Peters' store only once or twice per week for 15-20 minutes at a time, and sometimes not even enter the store. (Peters Dep. at 53-54.) Jaime Lopez would visit the store "maybe once every three months," and according to Peters the District Managers "never did anything to help." (*Id.* at 53-56.) Family Dollar's records indicate that during the relevant time period, Peters' District Manager oversaw twenty-five to twenty-seven stores throughout San Antonio, Texas, spanning a territory of approximately 209 to 215 miles. (DeBrocq Decl. ¶ 7.)

## **STANDARD OF REVIEW**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party always bears the initial burden of "informing the district court of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met the initial burden, "the non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). This is particularly important where the nonmoving party bears the burden of proof. *Hughes*, 48 F.3d at 1381. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. If the evidence is merely

5

colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249-50. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248. "The determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question," *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004), and the Fourth Circuit has repeatedly affirmed the grant of summary judgment where the facts demonstrate that an employee is exempt. *See, e.g., Grace v. Family Dollar Stores, Inc.*, 637 F. 3d 508 (4th Cir. 2011) (affirming grant of summary judgment and holding that Family Dollar Store Manager was exempt executive); *Darveau v. Detecon, Inc.*, 515 F.3d 334 (4th Cir. 2008); *Jones v. Virginia Oil Co., Inc.*, 69 Fed. Appx. 633 (4th Cir. 2003); *Smith v. First Union National Bank*, 202 F.3d 234 (4th Cir. 2000).

## **DISCUSSION**

The Fair Labor Standards Act ("FLSA") requires that an employee receive overtime pay if he or she works more than forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA, however, exempts from this requirement "any employee employed in a bona fide executive…capacity." 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has promulgated regulations which further describe and interpret the scope of this exemption.

The current regulations provide that an employee qualifies as an executive if: (1) he is compensated on a salary basis at a rate of at least $455 per week; (2) his primary duty is management of the enterprise; (3) he customarily and regularly directs the work of two or more other employees; and (4) he has the authority to hire or fire other employees or whose

suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.[4] 29 C.F.R. § 541.100(a) (2004).

Peters concedes in his Response that he is not challenging the first or third tests, thus the only tests at issue are (1) whether Peters' primary duty is management of the enterprise and (2) whether he has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. The DOL has also promulgated additional regulations which further describe and define these tests; these additional regulations are discussed below. In light of these regulations, Peters qualifies as an exempt executive.

1. **Family Dollar Satisfies the Primary Duty Test**

The regulations provide guidance as to how an employee's primary duty may be determined.[5] The regulations instruct that the determination should be "based on all the facts in a particular case." 29 C.F.R. § 541.700(a). The regulations set forth, but are not limited to, four factors to consider in this analysis: (1) the amount of time spent in the performance of managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the relative freedom from supervision; and (4) the relationship between the manager's salary and the wages paid to other employees for the kind of nonexempt work performed by the supervisor. (*Id.*)

Upon consideration of the factors identified for determining whether Peters' primary duty was management, the Court concludes that the factors are readily satisfied.

---

[4] Plaintiff incorrectly contends that "frequency of discretion" is an independent "primary duty factor." *See* (Doc. No. 950, Pl.'s Resp. at 23, 28-29.)
[5] The Court finds Peters' argument that he was merely a "working foreman" unavailing. The current regulations state that a "*manager in a retail establishment*" can "supervise employees and serve customers at the same time without losing the exemption." 29 C.F.R. § 541.106(b) (emphasis added). Section 29 C.F.R. § 541.106(c) states "[i]n contrast," a "working supervisor" who performs "nonexempt work *on the production line in a manufacturing plant* does not become exempt" merely by occasionally directing the work of other nonexempt employees on the "*production line*." (emphasis added).

### a. The Amount of Time Spent in Performance of Managerial Duties

The regulations provide a list of "management" activities, which include, but are not limited to:

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work, maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked, and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [employees] and the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.[6]

29 C.F.R. § 541.102.

Peters explicitly testified that he performed *almost every one* of these management activities as a Family Dollar Store Manager.[7] For example, Peters interviewed and screened potential employees and provided hiring recommendations (Peters Dep. at 82-92, 135-36, 233-34.); provided training to his employees on Family Dollar benefits, policies and procedures (*Id*. at 70-78, 114.); assigned employees to a schedule and set their individual hours of work, including having to adjust the schedule if employees needed or requested time off (*Id*. at 47-49, 162.); and directed and supervised his employees' work. (*Id*. at 170-75, 209-10, 237-40.) In addition, Peters maintained and

---

[6] An employee need not perform all management duties listed in the regulations, or evenly regularly perform such duties, in order to be considered an exempt executive. *See Aguirre v. SBC Communs., Inc.*, 2007 U.S. Dist. Lexis 72666, 63-62 (S.D. Tex. Sept. 30, 2007) (finding that "plaintiffs' 'primary duty' for purposes of the executive exemption was 'management,' despite the fact that the plaintiffs did not perform other 'managerial' duties listed in Section 541.102.").

[7] The fact that the Assistant Managers can perform the same tasks as Peters does not render his tasks and duties any less managerial. Courts have consistently held that the fact that a non-exempt employee may sometimes perform exempt duties does not make these duties any less exempt/managerial. *See Baldwin v. Trailer Inns., Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) ("[t]hat the [non-exempt] assistant managers may have performed some managerial tasks does not render the tasks non-exempt.").

was responsible for certain sales and financial records, as well as bank deposits and incident reports (*Id*. at 177-236.); evaluated the work of his employees for the purpose of recommending promotions (*Id*. at 118, 123-25.); and disciplined employees when necessary, informed his District Manager that he was doing so, and was never told by his District Manager that he could not do so. (*Id*. at 137-38, 145.) Furthermore, Peters was responsible for the safety and security of the store (*Id*. at 222-23.); controlling and staying within the allocated payroll budget (*Id*. at 163-64.); and monitoring legal compliance measures with respect to hiring, such as completing I-9 paperwork. (*Id*. at 117-18.)

Peters cannot overcome the exemption by claiming that he spent the majority of his time performing non-managerial duties. The regulations state that an employee who spends more than fifty percent of his or her time performing managerial work will typically satisfy the primary duty requirement. 29 C.F.R. § 541.700(b). The regulations, however, also emphasize that "time alone…is not the sole test" and that exempt executives are not required to spend more than fifty percent of their time performing exempt work if other factors support the conclusion that management is their primary duty.[8] *Id*. In *Grace*, the Fourth Circuit explained that "[t]here is no per se rule that once the amount of time spent on manual labor approaches a certain percentage, satisfaction of this factor is precluded as a matter of law." 637 F.3d 508, 515 (4th Cir. 2011).

---

[8] The Court disagrees with Peters' contention that failure to meet the 50 percent threshold means that an employee fails to satisfy the primary duty requirement. The Fourth Circuit clarified the application of the 50 percent "rule of thumb" by stating that, "[i]t is clear from this language that primary duty is meant to be assessed by the totality of the circumstances." *Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453, 456 (4th Cir. 2003). Peters' reliance on *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282 (4th Cir. 1986) is misplaced because the court held that it would apply the 50 percent rule to that specific case. Additionally, Peters' reliance on *Shockley v. City of Newport News*, 997 F.2d 18 (4th Cir. 1993) is also misplaced because that case involved police officers, not retail store managers, who were not paid on a salary basis – something that is not at issue here.

The regulations also specifically address the concept of concurrent duties. 29 C.F.R. § 541.106. Concurrent performance, or multi-tasking, of exempt and nonexempt work is explicitly recognized as a managerial duty by the DOL's regulations. *Id.*; *see also* 29 U.S.C. § 213(a)(1).[9] "It is misleading simply to add up the time that [Plaintiff] spent unloading trucks, stocking inventory, running cash registers, or sweeping floors and conclude thereby that he was merely a clerk and not a manager." *Grace*, F.3d at 516.

Peters was ultimately responsible for the performance of the store and remained the highest ranking employee in the store, even while performing nonexempt work. (Peters Dep. at 60, 62, 175, 185-86.) Thus, Peters "remain[ed] responsible for the success or failure of the business operations under [his] management while performing the nonexempt work." 29 C.F.R. § 541.106. In other words, Peters performed his nonexempt tasks in the context of his overall responsibility to ensure the store was profitable. *See Grace*, 637 F.3d at 516.

In *Grace*, the Fourth Circuit found the plaintiff "was performing management duties whenever she was in the store, even though she also devoted most of her time [99%] to doing the mundane physical activities necessary for its successful operation." 637 F.3d at 517. Similar to the plaintiff in *Grace*, even though Peters contends that he devoted 90-95% of his time to performing nonexempt work, he was also the person responsible for running the store and performed his nonexempt tasks concurrently with his exempt managerial work. (Peters Dep. at 236-39.) For example, Peters could direct who was going to run the cash register and who was going to clean the parking lot. (*Id.*) Moreover, as contemplated by 29 C.F.R. § 541.700(c), Peters had the discretion and flexibility to choose what tasks to perform himself and what tasks

---

[9] The FLSA recognizes the nature of retail business and states that "an employee of a retail or service establishment shall not be excluded from the definition of an employee employed in a bona fide executive or administrative capacity because of the number of hours in his work week which he devotes to activities not directly or closely related to the performance of executive or administrative activities." 29 U.S.C. § 213(a)(1).

to delegate to other employees. (*Id*.) Thus, Peters had a choice of which duties to perform, in contrast to a nonexempt employee who would simply perform the task to which he or she was assigned. (*Id*.) Peters also had the authority and the ability to direct other employees to perform this nonexempt work. (*Id*. at 170-75, 213-15, 237-40.)

While Peters argues that management was not his primary duty because he spent the majority of his time engaged in manual labor, the regulations and the Court in *Grace* clarify that performance of these duties, in conjunction with overall supervision and management of the store, is not contrary to the application of the exemption. Thus, Peters' own testimony regarding his duties and tasks reflect that they were undeniably managerial in nature and easily meet the requirements of the executive exemption. *See Grace*, 637 F.3d at 508.

### b. The Relative Importance of the Managerial Duties as Compared with Other Types of Duties

Peters' managerial duties were more important than the other duties he performed because they were critical to the operation of the store. In *Grace*, the plaintiff's managerial tasks, which included filling out paperwork, addressing customer complaints, working with employees on their schedules, and collecting cash, were critical to the operation of the store, as there was "*no one else at the site to direct these actions*." *Grace*, 637 F.3d at 517 (emphasis in original). Similarly, Peters' managerial tasks, which included interviewing and employee screening (Peters Dep. at 70-78, 233-34.), training (*Id*. at 114-17.), store security (*Id*. at 222-23.), bank deposits and financial and sales paperwork (*Id*. at 177, 236.), scheduling (*Id*. at 47, 209-10.), and the overall supervision and direction of his employees, were critical to the operation of the store. (*Id*. at 170-75, 237-40.)

While Peters argues that he was under the direct supervision of his District Manager, he nonetheless stated that District Manager Keith Sellers or one of his Assistant District Managers

11

visited Store 1683 only once or twice per week for 15-20 minutes at a time, and Jaime Lopez would visit the store "maybe once every three months." (*Id.* at 53-56.) Therefore, because he was the only person running the store, the store could not have operated successfully without Peters' handling of these managerial tasks.

### c. Relative Freedom from Supervision

Relative freedom from supervision does not demand complete freedom from supervision. In *Grace*, the plaintiff's supervising District Manager typically visited the store once every two to three weeks. *Grace*, 637 F.3d at 517. The court also noted, apart from her supervision, which was not uncharacteristic for any retail operation, the district manager was not a "micro-manager who constantly was looking over [the manager's] shoulder." *Id*. The supervision of seventeen stores would hardly permit [the District Manager] to micro-manage all of them. *Id*.; *see also Thomas v. Speedway Super America LLC*, 506 F.3d 496, 504-509 (6th Cir. 2007) (court found it significant that plaintiff's District Manager was responsible for ten to twelve stores, as opposed to situations where a higher level manager was responsible for only a few stores).

Peters was relatively free from supervision during the relevant time period. Peters testified that his District Manager visited the store only once or twice per week for 15-20 minutes at a time from October 2005 to January 2010, and "maybe once every three months" from January 2010 to April 2011. (Peters Dep. at 53-56.) Moreover, Family Dollar's records indicate that during the relevant time period, Peters' District Managers oversaw twenty-five to twenty-seven stores, including Peters' store, spanning a territory of approximately 209 to 215 miles in and around San Antonio, Texas. (DeBrocq Decl. ¶ 7.) Though Peters was in contact with his District Managers through regular conference calls, this does not equate to exacting supervision. In *Grace*, the Fourth Circuit held that the plaintiff was relatively free from direct supervision,

despite his being in contact with his District Manager by telephone and email, and being subject to company policies, procedures, and budgetary requirements, as this type of supervision "was not uncharacteristic for any retail operation." 637 F.3d at 517. The infrequency of the District Managers' visits and the large number of stores they were responsible for supervising does not allow them to micro-manage each individual store. *See Grace*, 637 F.3d at 517; *Thomas*, 506 F.3d at 508.

### d. Relationship Between Salary and Wages Paid to Other Employees for the Kind of Nonexempt Work Performed by the Supervisor

To determine the relationship between a managerial salary and wages paid to nonmanagerial employees, the Fourth Circuit considered, first, whether the manager earned more, in absolute terms, than nonmanagerial employees and, second, whether the manager was a "profit center." *Grace*, 637 F.3d at 517. This second consideration asks whether the manager had the ability to influence the amount of his compensation. *Id*.

As to the first consideration, Peters earned significantly higher amounts on an hourly basis than nonexempt workers. The record shows that of the forty-four nonexempt employees who worked at Peters' store during the relevant time period, twenty-one made $7 per hour or less, and the highest paid nonexempt employee earned only $8.50 per hour. (DeBrocq Decl. ¶ 9.) Even using the highest hourly wage for those employees whose wages changed over time, nonexempt employees received an average hourly wage of only $7.12 per hour. (*Id*.) In comparison, Family Dollar's records indicate that Peters worked an average of 55.69 hours per week. (*Id*. at ¶ 6.) Even setting aside his bonus payment, Peters earned compensation, which when computed on an hourly basis, averaged between $13.92 and $14.76 per hour during the relevant time period. (*Id*.) A review of these calculations reveals a significant difference in wages between Peters and his nonexempt employees.

13

As to the second consideration, Peters was a "profit center," his bonuses depended on his store's profitability and were directly tied to his performance in terms of sales, shrink, and inventory results. (Peters Dep. at 60, 62, 186.); *See Grace*, 637 F.3d at 517. Peters earned six bonuses of $2,127, $398, $2,267, $2,792, $3,063, and $3,455 during the relevant time period; bonuses for which nonexempt store employees were not eligible. (DeBrocq Decl. ¶ 5; Peters Dep. at 61.) Therefore, since Peters had the ability to directly influence his own compensation, this factor is satisfied.

### e. Frequency With Which the Employee Exercises Discretionary Power

While this factor is no longer an explicit factor in the "primary duty" analysis under the current regulations, the fact that Peters exercised discretion virtually every day and all day long in his capacity as store manager supports that his primary duty was management. Peters decided how to assign and apportion work among himself and his employees (Peters Dep. at 170-75, 213-15, 237-40.), how to adjust the schedule (*Id*. at 47, 209-10.), how to interview candidates (*Id*. at 70-78, 233-34.), and how to make sure the store ran safely (*Id*. at 222-23.); while at the same time satisfying customers. All of these tasks involved "discretionary acts inherent in being responsible for the successful operation of a retail store." *Grace*, 637 F.3d at 517. Moreover, the fact that Family Dollar maintains certain policies and procedures for the sake of consistency does not mean that Peters failed to exercise discretion in enforcing these policies and procedures.[10]

### 2. Authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight

---

[10] *See Murray v. Stuckey's, Inc.*, 50 F.3d 564, 570 (8th Cir. 1995) (standardized procedures and policies may circumscribe but do not eliminate discretion of on-site store manager); *Thomas v. Speedway Super America LLC*, 506 F.3d 496, 507 (6th Cir. 2007) (manager still exercised discretion on a daily basis even though store had standardized operating procedures); *Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508 (4th Cir. 2011) (manager still exercised discretion even though she was subject to company policies and the company template for a store in the Family Dollar chain).

14

Finally, the additional prong of the executive exemption test contained in the current regulations states that an exempt employee has authority to hire *or* fire other employees *or* his recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a)(4). The DOL provides guidance with respect to whether an employee's recommendations satisfy this standard. Specifically, the "factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Importantly, the employee's recommendations "may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status." *Id*.

Peters' deposition testimony establishes that he meets the additional prong of the executive exemption test contained in the current regulations, namely that his suggestions and recommendations as to the hiring and change of status of other employees were given particular weight. Peters was actively involved in the interviewing and employee screening process. (Peters Dep. at 70-92.) If Peters believed that the candidate should be hired, he made that recommendation to his District Manager, and could not recall a single instance where he was not involved in the hiring process for positions at his store. (*Id*. at 104.) Peters could recall only one instance where he was forced to hire someone that he did not agree with or recommend. (*Id*. at 104-06.) Furthermore, Peters was the only person at Store 1683 that had discussions with the District Manager regarding interviewing and hiring candidates for positions at his store. (*Id*. at

15

224-25.) Peters therefore effectively controlled which candidates were presented for possible District Manager approval. Courts have recognized that a manager plays an important role in the hiring process when he has the ability to veto a potential hire by not presenting the applicant to his supervisor. *See Pollard v. GPM Invs., LLC*, No. 3:10-cv-115, 2011 U.S. Dist. LEXIS 24199 at *27 (E.D. Va. Mar. 10, 2011) (holding that managers "had sufficient input in the hiring, firing, and promotions to justify their exemptions" where the managers screened applicants and determined whether they would continue in their application process).

In addition, Peters' District Managers closely followed Peters' promotion recommendations. Peters was involved in every single hiring and promotion decision at his store, and everyone that he recommended for promotion received a promotion "because the District Manager very seldom was active in [his] store." (Peters Dep. at 135.) Additionally, Peters made the decision to promote Frederico Romero, a decision with which the District Manager "strongly disagreed," but after the District Manager found out about the promotion the individual remained in the promoted position. (*Id.* at 133-35.) Peters also recommended that Olga Fuentes, Elizabeth Garcia, Tracie Garcia, and Vincent Munoz all be promoted, and the District Manager followed his recommendations. (*Id.* at 130-36.)

Therefore, while Peters may not have had the ultimate decision making authority with respect to hiring, it is undisputable that he controlled the screening process and at least some of his recommendations as to hiring, promotion and termination were closely followed, thereby satisfying the particular weight requirement.

## **CONCLUSION**

Looking at the facts in the light most favorable to the non-moving party, the Court finds that Family Dollar has satisfied the DOL regulations qualifying Gary Peters as an exempt

executive under the FLSA. No reasonable jury could find otherwise. Therefore, Family Dollar is entitled to judgment as a matter of law.

# **ORDER**

IT IS ORDERED that

(1) Defendant's Motion for Summary Judgment (Doc. No. 935) is GRANTED and Plaintiff Gary Peters is dismissed;

(2) The Court finds that there is no just reason to delay a finding of final judgment for Family Dollar with regard to Plaintiff Gary Peters' claim against Family Dollar;

(3) The Clerk is directed to enter final judgment, pursuant to Rule 54(b), for Family Dollar with regard to Plaintiff Gary Peters.

Signed: March 11, 2014

Graham C. Mullen
United States District Judge